**IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **DR. SYDNEY RADDING** | Civil No. _____ |
| *Plaintiff,* | |
| v. | **JURY TRIAL DEMANDED** |
| **VIRGINIA COMMONWEALTH UNIVERSITY HEALTH SYSTEMS AUTHORITY,** | |
| **and** | |
| **VIRGINIA COMMONWEALTH UNIVERSITY,** | |
| **and** | |
| **MCV ASSOCIATED PHYSICIANS, D/B/A MCV PHYSICIANS,** | |
| *Defendants.* | |

## COMPLAINT

Plaintiff, Dr. Sydney Radding ("Dr. Radding" or "Plaintiff") by and through her undersigned counsel, and for her Complaint against the Defendants, Virginia Commonwealth University Health System Authority ("VCUHS"), Virginia Commonwealth University ("VCU"), and MCV Associated Physicians, d/b/a MCV Physicians ("MCV Physicians"), collectively the "Defendants," states as follows:

## BACKGROUND

1.    Plaintiff brings this action against:

1

a. Defendants VCU and VCUHS for damages arising from violations of Virginia's Fraud and Abuse Whistleblower Protection Act ("VWPA"), Virginia Code Ann. § 2.2-3010 *et seq.;*

b. All Defendants for damages arising from violations of Virginia's Whistleblower Protection Law ("VWPL"), Virginia Code Ann. § 40.1-27.3 *et seq.;*

c. All Defendants for damages arising from violations of Virginia's Human Rights Act, Va. Code Ann. § 2.2-3900 *et seq.*[1]*;*

d. All Defendants for damages arising from violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* and

e. All Defendants for damages arising from common-law defamation.

2. Since the age of six, Dr. Radding dreamed of becoming a doctor. She knew at an incredibly young age that she was destined to take care of ill and injured people.

3. On November 14, 2022, Dr. Radding entered into a Physician Employment Agreement ("MCV Employment Agreement") with Defendant MCV Associated Physicians, d/b/a MCV Physicians. The term of the MCV Employment Agreement was from November 14, 2022, to June 30, 2023, and required Dr. Radding to provide services at MCV Physicians and VCUHS facilities.

4. MCV Physicians is the faculty group practice of which all clinicians are members as a condition of employment. VCU Health/VCU School of Medicine's June 15, 2022, "Intent to Offer Letter" to Dr. Radding.

5. Along with MCV Physicians, Dr. Radding was dual employed with VCUHS/VCU

---

[1] Dr. Radding just recently filed a charge of discrimination with the Virginia Office of Attorney General, Office of Civil Rights ("VA OCR"). When VA OCR issues the Notice of Right to Sue, Dr. Radding will amend her complaint to add that she has administratively exhausted this particular claim.

School of Medicine as an Assistant Professor at VCU in the Department of Surgery, Division of Acute Care Surgical Services ("ACSS"). The MCV Employment Agreement required Dr. Radding to, *inter alia,* have medical staff privileges at VCUHS and to hold a faculty appointment in the VCU School of Medicine as a continued condition precedent to her employment with MCV Physicians.

6. Prior to Defendants terminating Dr. Radding's employment, Dr. Radding received a base salary from VCU and a base salary from MCV Physicians.

7. The MCV Employment Agreement provided for immediate termination for Cause of said Agreement and Dr. Radding's employment with MCV Physicians if Dr. Radding lost her appointment as a faculty member of the VCU School of Medicine or her hospital privileges.

8. Absent termination of Dr. Radding's employment for cause, MCV Physicians intended to provide Dr. Radding with another MCV Employment Agreement effective July 1, 2023.

9. Not long after she was hired by Defendants, Dr. Radding started voicing her concerns about Defendants' practices relating to patient care and safety which violated state and federal patient care regulations. Dr. Radding's voiced concerns evolved over time into additional concerns about workplace safety and VCU's Medicare billing practices.

10. Even though Defendants praised Dr. Radding for being "who she is" in terms of her being vocal about these concerns, their "praise" was not long-lived or genuine.

11. Defendants relentlessly retaliated against Dr. Radding by requiring her to perform additional surgical duties, some of which she was not qualified to perform and which exposed her to potential medical malpractice claims; by publicly questioning her medical judgment; by questioning her mental fitness to care for patients, even though there was no medical evidence remotely suggesting she was not mentally fit to care for patients; by placing her on medical leave and not allowing her to return to work without first undergoing a psychiatric evaluation; by not renewing her contract--even

though her psychiatric evaluation cleared her to return to work- on the claimed grounds that she was not a "good fit" for VCU and MCV Physicians; and, finally, by revoking her privileges to operate—knowing that this revocation is the death knell for Dr. Radding's medical career.

12.    Defendants also discriminated against Dr. Radding on the basis of her sex (female) and retaliated against her for reporting her complaints of discrimination when they:

    a.    Prevented her from performing surgeries that she was clearly qualified to perform and instead required a male surgeon to perform these surgeries;

    b.    Refused to take seriously her reported concerns about patient safety and instead told her she took those concerns "too seriously";

    c.    Refused to take disciplinary action against a urology resident who made a gender-based stereotyped remark about.

    d.    Intentionally misrepresented her question of "How do I do this?"--which was made in the context of her personal situation--to mean she admitted to not being able to safely care for patients;

    e.    Forced her on administrative leave as a result of said misrepresented comment;

    f.    Subjected her to a mental fitness for duty evaluation without objective evidence of the need for such an evaluation;

    g.    Terminated her contract, and refused to renew her contract--even though she passed the mental fitness for duty evaluation; and

    h.    Withdrew her surgical privileges.

13.    Defendants, through their agents Drs. Aboutanos and Kasirajan, defamed Dr. Radding when they intentionally made false statements about her to prospective employers.

**PARTIES**

4

14.     Plaintiff, Dr. Sydney Radding, was employed by Defendants from November of 2022, until July 4, 2023, at VCU's medical facility located at 1250 E. Marshall Street, Richmond, Virginia 23219.

15.     "The [B]oard of [V]isitors of Virginia Commonwealth University (the [B]oard) is a corporation under the name and style of 'Virginia Commonwealth University.'" Virginia Code Ann. § 23.1-2300.

16.     Virginia Code Ann. § 23.1-2301 identifies the purpose of VCU's Board, which is to "establish[] and maintain[] a university consisting of colleges, schools, and divisions offering undergraduate and graduate programs in the liberal arts and sciences and courses of study for the professions."

17.     Defendant VCUHS "is established as a public body corporate, public instrumentality, and political subdivision of the Commonwealth [of Virginia]." Virginia Code Ann. § 23.1-2401(A).

18.     The purpose of VCUHS is "to exercise public and essential government functions to provide for the health, welfare, convenience, knowledge, benefit, and prosperity of the residents of the Commonwealth and such other individuals who might be served by the Authority by delivering and supporting the delivery of medical care and related services to such residents and individuals, providing educational opportunities in the medical field and related disciplines, conducting and facilitating research in the medical field and related disciplines, and enhancing the delivery of health care and related services to the Commonwealth's indigent population." Virginia Code Ann. § 23.1-2401(B).

19.     VCUHS is statutorily authorized to:

*       "Facilitate and support the health education, research, and public service

5

activities of the Health Sciences Schools of the University," Va. Code Ann. § 23.1-2401(B)(3);

\*       "Operate and manage general hospital[s] and other health care facilities…," Va. Code Ann. § 23.1-2401(B)(6); and

\*       operate and maintain "teaching hospitals and related facilities for the benefit of the Commonwealth and its citizens and such other individuals who might be served by the Authority." Va. Code Ann. § 23.1-2401(C).

20.      VCU and VCUHS are affiliated entities with overlapping leadership. Dr. Michael Rao, Ph.D., is the President and Chair of VCUHS's Board of Directors, as well as the President of VCU. *See* Senior Leadership | VCU Health. Dr. Marlon Levy, M.D., currently serves as both the Interim Senior Vice President for VCU Health Sciences and as the Interim CEO for VCUHS. *See id.* Additionally, "five VCU faculty physicians serve as members of the VCU[HS] Board of Directors." *See* https://bulletin.vcu.edu/about/vcu-health-system-authority/.

21.      VCUHS coordinates and integrates the clinical activities of MCV Hospitals, MCV Physicians, and the VCU School of Medicine. *See* https://bulletin.vcu.edu/about/vcu-health-system-authority/

22.      Defendant MCV Physicians is a Virginia nonstock corporation qualified as tax exempt pursuant to Section 501(c)(3) of the Internal Revenue Code. The corporate powers of MCV Physicians "are exercised by or under the authority of, and its business is managed under the direction of, its Board of Directors…, subject to the powers and authority of the Virginia Commonwealth University Health Systems Authority (the 'VCU Health System' or 'VCUHS'), the sole corporate member of MCV Physicians.

23.      VCU, VCUHS, and MCV Physicians, are affiliated entities with overlapping

leadership. Dr. Arturo P. Saavedra is an *ex officio* member of MCV Physicians' Board of Directors currently serving as the Board Chair, he is the Dean of VCU's School of Medicine, and he is the Executive Vice President for Medical Affairs of VCUHS. Dr. Vigneshwar Kasirajan is an *ex officio* member of MCV Physicians' Board Director and is the head of VCU's Department of Surgery. *See* https://www.vcuhealth.org/mcv-physicians-board-of-directors.

24.     VCU, VCUHS, and MCV Physicians are affiliated entities with substantially similar interests. Dr. Radding's Employment Agreement contains these significant provisions:

> Due to your dual employment and/or adjunct faculty appointment with VCU Medical School and MCV Physicians, you recognize that MCV Physicians, VCUHS and VCU have a legitimate need to know and share confidential employment and other information. In consideration of your employment and/or faculty appointment, you hereby: (i) authorize and consent to MCV Physicians, VCUHS and VCU sharing any of your confidential employment and other information in their knowledge, possession, or control with one another…Such information may include, but is not limited to: compensation records, benefits, medical and leave information, employment history, qualifications and ability, hospital and medical staff privileges, arrest records, performance, duties, attendance, character, academic record, behavior, attitude, any disciplinary issues perceived by them, or any other information that may impact your employment or employability in any way.

Dr. Radding's Employment Agreement with MCV Physicians at Section 20, page 12.

Additionally, Dr. Radding was bound to comply with "all policies and procedures of MCV Physicians, as well as applicable polices and procedures of VCU and the VCU Health System [VCUHS], including the VCUHS Code of Conduct. *Id.* at Section 10, page 8.

25.     Defendant VCU was Dr. Radding's "employer" as that term is defined in Title VII, *see* 42 U.S.C. § 2000e(b); the VHRA, *see* Va. Code Ann. § 2.2-3905(A); the VWPA, *see* Va. Code Ann. § 2.2-3010; and the VWPL, *see* Va. Code Ann. § 40.1-27.3, and employs more than 500 employees.

26.     Defendant VCUHS was Dr. Radding's "employer" as that term is defined in Title VII, *see* 42 U.S.C. § 2000e(b); the VHRA, *see* Va. Code Ann. § 2.2-3905(A); the VWPA, *see* Va. Code

Ann. § 2.2-3010; and the VWPL, *see* Va. Code Ann. § 40.1-27.3, and employs more than 500 employees.

27. Defendant MCV Physicians was Dr. Radding's "employer" as that term is defined in Title VII, *see* 42 U.S.C. § 2000e(b); the VHRA, *see* Va. Code Ann. § 2.2-3905(A); the VWPA, *see* Va. Code Ann. § 2.2-3010; and the VWPL, *see* Va. Code Ann. § 40.1-27.3, and employs more than 500 employees.

28. Due to Defendants' substantially similar interests with each other, Dr. Radding's duties and obligations to all Defendants, the overlap of leadership between the three Defendants, the overlap of decisionmaking responsibilities pertaining to Dr. Radding's employment, VCU, VCUHS, and MCV Physicians were Dr. Radding's joint employers.

## TIMELINESS OF FILING

29. A person who alleges a violation of Virginia's Fraud and Abuse Whistleblower Protection Act ("VWPA"), Va Code Ann. § 2.2-3010 *et seq.*, must bring an action under that section within three (3) years of the date the "unlawful discharge, discrimination, or retaliation occurs." *Id.* at § 2.2-3011(D).

30. A person who alleges a violation of Virginia's Whistleblower Protection Law ("VWPL") Va. Code Ann. § 40.1-27.3, must bring a civil action in a court of competent jurisdiction within one year of the employer's prohibited retaliatory action. *See* Va. Code Ann. § 40.1-27.3(C).

31. A person who alleges a violation of the Virginia Human Rights Act ("VHRA") and Title VII of the Civil Rights Act of 1964 must file a charge with the respective agencies within 300 days of the discriminatory action. *See* 42 U.S.C. § 2000e-5(e)(1).

32. On April 10, 2023, Defendants informed Dr. Radding that her contract would not be renewed, and on July 4, 2023, Defendants terminated Dr. Radding.

8

33. On February 1, 2024, Plaintiff filed a charge of discrimination arising under Title VII with the EEOC, which her undersigned counsel amended on February 2, 2024.

34. On February 2, 2024, Plaintiff's undersigned counsel filed a charge of discrimination arising under the Virginia Human Rights Act with the Virginia Office of the Attorney General – Office of Civil Rights.

35. Plaintiff's administrative charges were timely filed within 300 days of April 10, 2023.

36. Plaintiff's instant Complaint is timely filed within one year of April 10, 2023, for purposes of meeting the statute of limitations under the VWPL.

37. Plaintiff's instant Complaint is timely filed within three years of April 10, 2023, for purposes of meeting the statute of limitations under the VWPA.

38. Plaintiff's claims for common-law defamation are timely filed within one year after her cause of action accrued on or after July 4, 2023. Va. Code Ann. § 8.01-247.1.

## JURISDICTION AND VENUE

39. This Court has federal question subject-matter jurisdiction over Plaintiff's claims arising under Title VII. *See* 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

40. This Court has supplemental jurisdiction over Plaintiff's state law claims, to-wit, her claims arising under the VHRA, VWPA, VWPL, and her common-law defamation claims, because her state-law claims are so related to her Title VII claims that they form part of the same case or controversy.

41. This Court has personal jurisdiction over Defendants because they have sufficient minimum contacts in Virginia or have otherwise intentionally availed themselves of the Virginia market so as to render the exercise of personal jurisdiction over them by this Court to be consistent with traditional notions of fair play and substantial justice.

42.     Venue in this Court is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

43.     Within 300 days of the illegal conduct of which she complains, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") (Charge No. 438-2024-00055) and the Virginia Office of Attorney General – Office of Civil Rights. *See* **Exhibit A.**

44.     On February 12, 2024, the EEOC issued Plaintiff a Notice of Right to Sue on her Title VII charge. *See* **Exhibit B.**[2]

45.     Plaintiff has satisfied all administrative prerequisites to bringing her Title VII claim.

## STATEMENT OF FACTS

46.     On or around November 14, 2022, Dr. Radding began working for Defendants at VCU's main hospital located at 1250 E. Marshall Street, Richmond, Virginia 23298.

47.     Dr. Radding was hired to work in VCU's Department of Surgery, Acute Care Surgical Services Division ("ACSS") as an Assistant Professor and Physician.

**Dr. Radding identifies and voices concerns about multiple patient care and safety issues, which include, but are not limited to:**

*Patient Safety Case #1:*

48.     ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[2] At the time of filing the instant Complaint, Plaintiff has not received a Notice of Right to Sue from the Virginia Office of Civil Rights. Once received, the Plaintiff will amend her complaint to add claims of discrimination under the VHRA.

████████████████████████████████████████████████████

██████ █████ █ █ █████ ███████ █████ ██████ ██████ ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████.

49.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.

50.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

51.    ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.

52.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████.

11

53. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ A Medicare

hospital must "provide an appropriate medical screening examination with the capability of the

hospital's emergency department, including ancillary services routinely available to the emergency

department, to determine whether or not an emergency medical condition exists." 42 C.F.R. §

489.24(a)(i).

54. Dr. Radding voiced her concerns about ACSS's misdiagnosis to senior surgeons Dr.

Whelan and Dr. Aboutanos (who served as Dr. Radding's immediate supervisor) and her concerns about

ACSS's failure to consult with an inflammatory bowel disease expert with colorectal surgeon Dr. Jamie

Bohl, who agreed on multiple occasions that the patient's misdiagnosis stemmed from gross

negligence on the part of ACSS and the GI Department.

***Patient Safety Case #2:***



55. ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████.

56. ████████████████████████████████████

████████████████████████████████████████.

57. ████████████████████████████ ████████ ██████████

---

3 ████████████████████████████████████████████████-

████████████████████████████████████████████████████████

████████████████████████████████████████ .

58.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████

(i)     ████████████████████████████████████████ ;

(ii)    ██████████████████████████████████

(iii)   ████████████████████████████████████

59.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

60.    ████████████████████████████████████████████

██████████████████████████████████████████████

61.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

████████ .

███████████████████████████████████████████████████████

██████████████████████████

62.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

63.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

64.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

65.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

66.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

67.     ████████████████████████████████████████████████

14



68.     VCU and VCUHS violated 42 C.F.R. § 489.20(r)(2), which provides that a Medicare hospital must maintain "[a]n on-call list of physicians who are on the hospital's medical staff or who have privileges at the hospital…available to provide treatment necessary after the initial examination to stabilize individuals with emergency medical conditions who are receiving services under § 489.24 in accordance with the resources available to the hospital."

69.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

70.     VCU and Dr. Newton violated Section 1867 of the Social Security Act, which provides for enforcement actions against both a physician and hospital when a physician who is on the hospital's on-call list fails or refuses to appear within a reasonable period of time after being notified to appear.

71.     Defendants violated 42 C.F.R. § 489.25(j)(1) when it failed to have policies and procedures in place to "respond to situations in which a particular specialty is not available, or the on-call physician cannot respond because of circumstances beyond the physician's control."

***Patient Safety Case #3:***

72. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

73. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

74. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

75. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

76. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████

77. ██████████████████████████████████████████████████

█████████████████████████████████████

78. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████

79.

80.

81.

82.     Defendants' knowing failure to correct the problem of the day surgeons not providing the requisite sign out information to Dr. Radding violated ACGME Program Requirements for Graduate Medical Education in Surgical Critical Care ("ACGME Requirements for GME in Surgical Critical Care"), which requires "Programs, in partnership with their Sponsoring Institutions, must ensure and monitor effective, structured, hand-over processes to facilitate both continuity of care and patient safety." ACGME Requirements for GME in Surgical Critical Care, Section VI.E.3.b), "Transitions of Care."

83.     Virginia Commonwealth University School of Medicine ("VCU School of Medicine") is the Program run by VCUHS, the Sponsoring Institution, as the words "Program" and "Sponsoring Institutions" are used and referenced in the ACGME Program Requirements for Graduate Medical Education in Surgical Critical Care.

84.     Defendants violated 42 C.F.R. § 489.25(j)(1) when they failed to have policies and

procedures in place to "respond to situations in which a particular specialty is not available, or the on-call physician cannot respond because of circumstances beyond the physician's control."

85. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

86. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

87. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

***Patient Safety Case #4:***

88. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

89.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████

90.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

91.     ████████████████████████████████████████████████

19

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

92.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

93.     During this meeting, Dr. Radding expressed concerns about the refusal to report the patient's death. She expressed these concerns to Drs. Aboutanos, Anand, Whelan, Jinadasa, and Sadler.

94.     By refusing to report the unsafe events leading to the patient's death to the Hospital, Defendants violated ACGME General Surgery Requirements, which provide that, "[r]eporting, investigation, and follow-up of adverse events, near misses, and unsafe conditions are pivotal mechanisms for improving patient safety and are essential for the success of any patient safety program." ACGME General Surgery Requirements, Section VI(A)(1)(3).

95.     By refusing to report the unsafe events leading to the patient's death to the Hospital, Defendants violated Virginia Code Section 54.1-2909, which requires "any evidence that indicates a reasonable belief that a person licensed under this chapter…has or may have engaged in intentional or negligent conduct that causes or is likely to cause injury to a patient" be "reported within 30 days of their occurrence to the Board."

96.     By refusing to report the unsafe events leading to the patient's death to the Hospital, Defendants violated VCU's "Duty to Report and Protection from Retaliation" provision, which states that VCU employees are "*required* to report known or suspected misconduct to the resources below regardless of their personal feelings or beliefs about the misconduct or those involved in the

20

misconduct." This provision also requires "any employee in management [who] receives a report…to contact the ICO-ACS for tracking purposes, support and guidance." VCU's Duty to Report and Protection from Retaliation at 3.

**Patient Safety Case #5:**



97.

98.

99.

100.    Dr. Radding again stated that she was not comfortable performing the surgery and asked for a senior surgeon to be present.

101.    Dr. Rodas then said he would perform the surgery and requested that Dr. Radding assist.

102.



105. Dr. Radding reported this deviation from the standard of care to senior surgeon Dr. Whelan, who appeared to understand Dr. Radding's discomfort with performing the procedure, stating that he was appalled and scared by Dr. Rodas's decision to have Dr. Radding perform this surgery and by his communications to Dr. Radding during and after the surgery. Dr. Aboutanos was also made aware of Dr. Rodas' decisions and stated Dr. Radding should never have been placed in that situation.

107.

108.

109.

110.

111.



112. In Dr. Radding's debrief meeting with Drs. Rodas and Aboutanos, she told them that they were not prepared, the patient should not have been cleared for surgery based on his morning lab reports, and Dr. Rodas nearly intentionally killed the patient.

113. Dr. Radding also spoke numerous times with Dr. Whelan about this near miss event, and he agreed with her and said what she attempted to do was correct.

114.

115.

116.

117. On January 5, 2023, Dr. Radding met with Dr. Aboutanos for approximately three hours, during which she expressed her belief that there was profound misjudgment, discrimination, and disregard for patients and their staff. She threatened to quit, unless Dr. Aboutanos addressed the issues she raised. She told Dr. Aboutanos that he had pushed her to be legally responsible for an operation

that she had no business performing, and the senior partner he assigned (Dr. Rodas) did not teach her, did not check the morning labs, and certainly did not want to stop when the patient was nearly dead.

118.    Dr. Radding also told Dr. Aboutanos on January 5, 2023, that he (Dr. Aboutanos) actively undermined her, especially in front of residents who roll their eyes at her; that he consistently ignored her or minimized her when she came to him with concerns of patient safety issues and discrimination, and his own surgeons failing to meet standards of care.

119.    Instead of responding to her concerns, Dr. Aboutanos told Dr. Radding during their January 5, 2023, meeting: "I need to know that you will be loyal, and that if I don't agree with you that you won't try to go above me to Dr. Kasirajan [Chair of Surgery] to get it your way." Dr. Radding responded by telling Dr. Aboutanos that as long as he respects her, treats her like a talented surgeon, and hears her concerns, that is all that matters.

120.    In Dr. Aboutanos' January 5, 2023, email to Dr. Radding, which occurred after their in-person meeting, he told Dr. Radding he appreciated her "feedback and the suggestions to improve our system." He also said, "I routinely reach out to members of the team to assure we are still on the mission that we set out. I heard from you today that we may not be." Unfortunately, Dr. Aboutanos did not follow through with his implied promise to take action on Dr. Radding's concerns.

121.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

122.    Neither Dr. Rodas nor Dr. Aboutanos reported the patients near death to the Board.

123. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

124. ██████████████████████████████████████████

████████████████████████████████████████

125. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████

126. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

127. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

128. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

129. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

130.     By refusing to report the unsafe events leading to the patient's death to the Hospital, Defendants violated ACGME General Surgery Requirements, which provides that, "[r]eporting, investigation, and follow-up of adverse events, near misses, and unsafe conditions are pivotal mechanisms for improving patient safety and are essential for the success of any patient safety program." ACGME General Surgery Requirements, Section VI(A)(1)(3).

131.     By refusing to report the unsafe events leading to the patient's death to the Hospital, Defendants violated Virginia Code Section 54.1-2909, which requires that "any evidence that indicates a reasonable belief that a person licensed under this chapter…has or may have engaged in intentional or negligent conduct that causes or is likely to cause injury to a patient" be "reported within

30 days of their occurrence to the Board."

132.     By refusing to report the unsafe events leading to the patient's death to the Hospital, Defendants violated VCU's "Duty to Report and Protection from Retaliation" provision, which states that VCU employees are "***required*** to report known or suspected misconduct to the resources below regardless of their personal feelings or beliefs about the misconduct or those involved in the misconduct." This provision also requires "any employee in management [who] receives a report…to contact the ICO-ACS for tracking purposes, support and guidance." VCU's Duty to Report and Protection from Retaliation at 3.

***Patient Safety Case #6:***

133.     ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████ .

134.     ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

135.     ████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

136.     ████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

137.    Defendants violated 42 C.F.R. § 489.20(r)(2), which provides that, a Medicare hospital must maintain "[a]n on-call list of physicians who are on the hospital's medical staff or who have privileges at the hospital…available to provide treatment necessary after the initial examination to stabilize individuals with emergency medical conditions who are receiving services under § 489.24 in accordance with the resources available to the hospital."

138.    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

139.    VCU violated 42 C.F.R. § 489.25(j)(1) when it failed to have policies and procedures in place to "respond to situations in which a particular specialty is not available, or the on-call physician cannot respond because of circumstances beyond the physician's control."

*Patient Safety Case #7:*

140.    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████

141.    ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

142.    ████████████████████████████████████████████████████████████

████████████████████████████████████████

143.    By failing to inform Dr. Radding of the patient's plan of care, Defendants violated ACGME General Surgery Requirements "Transitions of Care" provisions, which require programs,

in partnership with their Sponsoring Institutions (VCU) to "ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety." ACGME General Surgery Requirements, Section VI(E)(3)(b).

144. The "program" in this case is the Virginia Commonwealth University School of Medicine ("VCU School of Medicine"). The "sponsoring institution" in this case is VCUHS.

145. By failing to follow up and report the near miss, Defendants violated ACGME Program Requirements for Graduate Medical Education in General Surgery (effective date July 1, 2022) ("ACGME General Surgery Requirements"), which provides that, "All physicians share responsibility for promoting patient safety and enhancing quality of patient care." ACGME General Surgery Requirements VI.A.1. ACGME General Surgery Requirements further provide that reporting unsafe patient conditions are "pivotal mechanisms for improving patient safety and are essential for the success of any patient safety program." *Id.* at V1.A.1(a)(3).

146. VCU's "Duty to Report and Protection from Retaliation" (revision 09/28/2022) ("VCU's Duty to Report") requires "all employees to report any known or suspected violation of applicable laws, regulations, or university policies, hereinafter referred to as misconduct, in a timely manner regardless of their personal feelings [or] beliefs about the misconduct in those involved." *Id.* at 1. "Misconduct" includes both intentional and unintentional conduct. *Id.* at 2. VCU provides for various reporting mechanisms, including, but not limited to, reporting misconduct to the reporter's immediate supervisor or department head. *Id.* at 3.

147. Virginia Code Ann. § 54.1-2909 requires that a physician report within 30 days of an occurrence to the Board any evidence that "indicates a reasonable belief that a person licensed under this chapter…has or may have engaged in intentional or negligent conduct that causes or is likely to cause injury to a patient or patients."

30

148.

***Patient Safety Case #8:***

149.

150.

151.

152.

153.    The urology resident (male) blamed Dr. Radding for the failure to order the imaging tests for the patient. The urology resident told Dr. Radding, "Well, it seems like you are the kinda girl

who is going to call me because you are too afraid to ever put in a foley."

154.   Dr. Radding reported the urology resident's derogatory and gender-based discriminatory statement to Dr. Aboutanos. Dr. Aboutanos minimized the urology resident's gender stereotyped statement and disrespectful treatment of Dr. Radding by telling Dr. Radding that the resident was just "playing a joke" on her.

155.   Dr. Aboutanos claimed there was a protocol in place for treating urethral injuries. When Dr. Radding responded that she had already looked, but there was no such protocol, Dr. Aboutanos responded by saying, "Sydney, you gotta lower your standard of care, and stop caring too much." Dr. Radding reported his demeaning comment to Dr. Whelan, but he never followed up with her or addressed the issue with the resident.

*Patient Safety Case #9:*

156.   ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

157.   ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

158.   Dr. Radding attempted to contact Dr. Aboutanos again and left a voicemail on his phone; however, he never responded. Dr. Radding reported the event to Drs. Proctor, Whelan, and Caitlin.

32

159.    Dr. Aboutanos ultimately accepted responsibility for his error in judgment, but he failed to report it to the Board.

160.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

161.    By failing to report the event, Defendants violated ACGME Program Requirements for Graduate Medical Education in General Surgery (effective date July 1, 2022) ("ACGME General Surgery Requirements"), which provides that, "All physicians share responsibility for promoting patient safety and enhancing quality of patient care." ACGME General Surgery Requirements VI.A.1. ACGME General Surgery Requirements further provide that reporting unsafe patient conditions are "pivotal mechanisms for improving patient safety and are essential for the success of any patient safety program." *Id.* at V1.A.1(a)(3).

162.    VCU's "Duty to Report and Protection from Retaliation" (revision 09/28/2022) ("VCU's Duty to Report") requires "all employees to report any known or suspected violation of applicable laws, regulations, or university policies, hereinafter referred to as misconduct, in a timely manner regardless of their personal feelings [or] beliefs about the misconduct in those involved." *Id.* at 1. "Misconduct" includes both intentional and unintentional conduct. *Id.* at 2. VCU provides for various reporting mechanisms, including, but not limited to, reporting misconduct to the reporter's immediate supervisor or department head. *Id.* at 3.

163.    Virginia Code Section 54.1-2909 requires that a physician report within 30 days of an occurrence to the Board any evidence that "indicates a reasonable belief that a person licensed under this chapter…has or may have engaged in intentional or negligent conduct that causes or is likely to

33

cause injury to a patient or patients."

164. ███████████████████████████████████████████

████████████████████████████████████

### Patient Safety Cases #10

165. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

166. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

167. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

168.  Dr. Radding had previously complained to Dr. Aboutanos about the day surgeons'

failures to provide her with adequate sign-out information and their refusal to provide her with assistance when they were on backup call. Dr. Aboutanos responded by telling Dr. Radding their actions were unforgiveable.

169.    Dr. Radding also complained to Dr. Whelan about these actions of the day surgeons. He responded that he was appalled and told Dr. Radding they would discuss the issue again at their "quality improvement meeting." Dr. Radding told Dr. Whelan that she has to repeat the same story every week and nothing changes. She told Dr. Whelan she wanted her partners to be accountable for their failing to fulfill their duties and for putting patients and her license at risk.

170.    Because the day surgeons' actions continued abated, on information and belief, neither Dr. Aboutanos or Dr. Whelan reported the surgeons' actions to the Board.

171.    By failing to report the events, Defendants violated ACGME Program Requirements for Graduate Medical Education in General Surgery (effective date July 1, 2022) ("ACGME General Surgery Requirements"), which provides that, "All physicians share responsibility for promoting patient safety and enhancing quality of patient care." ACGME General Surgery Requirements VI.A.1. ACGME General Surgery Requirements further provide that reporting unsafe patient conditions are "pivotal mechanisms for improving patient safety and are essential for the success of any patient safety program." *Id.* at V1.A.1(a)(3).

172.    VCU's "Duty to Report and Protection from Retaliation" (revision 09/28/2022) ("VCU's Duty to Report") requires "all employees to report any known or suspected violation of applicable laws, regulations, or university policies, hereinafter referred to as misconduct, in a timely manner regardless of their personal feelings [or] beliefs about the misconduct in those involved." *Id.* at 1. "Misconduct" includes both intentional and unintentional conduct. *Id.* at 2. VCU provides for various reporting mechanisms, including, but not limited to, reporting misconduct to the reporter's

immediate supervisor or department head. *Id.* at 3.

173.    Virginia Code Section 54.1-2909 requires that a physician report within 30 days of an occurrence to the Board any evidence that "indicates a reasonable belief that a person licensed under this chapter…has or may have engaged in intentional or negligent conduct that causes or is likely to cause injury to a patient or patients."

174.    By failing to report to the Board Dr. Jinadasa's and Dr. Caitlin's failures to perform their duties, which failures were likely to cause injury to the patients referenced in Paragraphs 165 and 166, *supra,* Defendants violated Virginia Code Section 54.1- 2909.

**Dr. Radding is required to report instances of misconduct and violations of laws and regulations.**

175.    ACGME Program Requirements for Graduate Medical Education in General Surgery (effective date July 1, 2022) ("ACGME General Surgery Requirements") provides that, "All physicians share responsibility for promoting patient safety and enhancing quality of patient care." ACGME General Surgery Requirements VI.A.1. ACGME General Surgery Requirements further provide that reporting unsafe patient conditions are "pivotal mechanisms for improving patient safety and are essential for the success of any patient safety program." *Id.* at V1.A.1(a)(3).

176.    VCU's "Duty to Report and Protection from Retaliation" (revision 09/28/2022) ("VCU's Duty to Report") requires "all employees to report any known or suspected violation of applicable laws, regulations, or university policies, hereinafter referred to as misconduct, in a timely manner regardless of their personal feelings [or] beliefs about the misconduct in those involved." *Id.* at 1. "Misconduct" includes both intentional and unintentional conduct. *Id.* at 2. VCU provides for various reporting mechanisms, including, but not limited to, reporting misconduct to the reporter's immediate supervisor or department head. *Id.* at 3.

177.    Virginia Code Section 54.1-2909 requires that a physician report within 30 days of an occurrence to the Board any evidence that "indicates a reasonable belief that a person licensed under this chapter…has or may have engaged in intentional or negligent conduct that causes or is likely to cause injury to a patient or patients."

178.    █████████████████████████████████████████████

███████████████████████████████████████████

| PATIENT SAFETY CASES | TO WHOM DR. RADDING REPORTED THE MISCONDUCT | CONDUCT CAUSED OR WAS LIKELY TO CAUSE INJURY TO THE PATIENT | STATUTE, REGULATION, AND/OR GUIDANCE VIOLATED |
|---|---|---|---|
| Patient #1 | Dr. Proctor, Dr. Whelan, Dr. Aboutanos Dr. Bohl | ████████████ ███████ | 42 C.F.R. § 489.24; American College of Gastroenterology National Practice Guidelines and the American College of Colorectal Surgery: National Surgical Practice Guidelines |
| Patient #2 | Dr. Whelan Dr. Aboutanos Dr. Anand Dr. Jinadasa | ████████████ ████████████ █████████ ██████████ █████ | Section 1867 of the Social Security Act; American College of Surgeon's Statement on Principles; 42 C.F.R. §§ 482.51(a)(4), 482.639(a), 489.20(r)(2), 489.25(j)(1); |
| Patient #3 | Dr. Whelan Dr. Aboutanos | ████████████ █████████ | ACGME General Surgery Requirements, Section VI(E)(3)(b); American College of Surgeon's Statement on Principles; 42 C.F.R. §§ 482.51(a)(4), 482.639(a), 489.25(j)(1) |

| | | | |
|---|---|---|---|
| Patient #4 | Dr. Aboutanos<br>Dr. Anand<br>Dr. Whelan<br>Dr. Jinadasa<br>Dr. Sadler | ██████████████<br>███ | ACGME General Surgery Requirements, Section VI(A)(1)(3);<br>VCU's Duty to Report and Protection from Retaliation;<br>Va Code Ann. § 54.1-2909;<br>42 C.F.R. § 482.55 |
| Patient #5 | Dr. Aboutanos<br>Dr. Whelan<br>Dr. Proctor<br>Dr. Rodas<br>Dr. Jinadasa | ██████████████<br>███ | American College of Surgeon's Statement on Principles;<br>VCU's Duty to Report and Protection from Retaliation;<br>Va Code Ann. § 54.1-2909;<br>42 C.F.R. §§ 482.51(a)(4), 482.55, 482.639(a) |
| Patient #6 | Dr. Whelan<br>Dr. Kim | ██████████████ | 42 C.F.R. §§ 482.55, 489.20(r)(2), 489.25(j)(1) |
| Patient #7 | Dr. Rodas<br>Dr. Aboutanos | ██████████████<br>████████<br>███████████████<br>████████<br>██████████████. | ACGME General Surgery Requirements, Section VI.E.3.b;<br>ACGME General Surgery Requirements VI.A.1;<br>VCU's Duty to Report;<br>Virginia Code § 54.1-2909 |
| Patient #8 | Dr. Aboutanos<br>and Beth Broering | ██████████████<br>████████<br>██████████████<br>██████████<br>██████████████<br>████████ | 42 C.F.R. § 482.55 |
| Patient #9 | Dr. Proctor,<br>Dr. Whelan<br>Dr. Caitlin | ███████████████<br>██████████<br>██████████████<br>██████████████ | ACGME General Surgery Requirements VI.A.1;<br>VCU's Duty to Report;<br>42 C.F.R. § 482.55;<br>Va Code Ann. § 54.1-2909 |



| Patients #10 | Dr. Aboutanos Dr. Whelan | ████████████ ███████ █████████████ █████████ ███████████ ███ █████████ █████████████ █████████ ██████████████ █████████ ███████████ ████████████ ██████████ ████████████ | ACGME General Surgery Requirements, Section VI(E)(3)(b); Virginia Code Section 54.1- 2909 |
|---|---|---|---|

**Defendants refuse to take any disciplinary action against a nurse who falsely claims that Dr. Radding's actions concerning a patient undergoing surgery are not safe.**



179. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████

180. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

181. ████ ██████████ ██████ ██████ ████ ████ ████ █████ ████ ████ ████ █ ████████████████████████████████████████████████ ██████████████████████████████████

182.    Dr. Radding told Dr. Sadler that the nurse's accusation caused her to have "panic attacks for hours and was for the first time in my life had someone look me in the eyes and tell me I didn't care about patients when I had been up for 24 hours." Dr. Sadler responded, "If she knew shit

about shit, she'd know that you care almost TOO much about patients."

183.    Debbie Walton, RN, Nursing Director of Main Operating Room, told Dr. Radding in response to Nurse Nonnemacker's comment she knew Dr. Radding worked non-stop for the patients, and she herself, as well as the anesthesia attending in charge of the OR, have praised Dr. Radding and sent those praises up to Dr. Kasirajan, Chief of Surgery. Ms. Walton told Dr. Radding she had no doubt that what Dr. Radding did was safe, and she promised Dr. Radding that Nurse Nonnemacker would be reprimanded. She also promised Dr. Radding she would work with Dr. Whelan to ensure she was formally cleared, and it would not happen again.

184.    █████████████████████████████████████████
███████████████████████████████████████████████████
████████████

185.    █████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████ ██ ████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████

186.    █████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████

187.    On February 24, 2023, Dr. Radding and Dr. Aboutanos exchanged texts about Nurse Nonnemacker's comment. Dr. Radding told him, "I am still very uneasy about the nurse making claims I'm unsafe and knowing my status in the system as that's a trigger for firing." Dr. Aboutanos told Dr. Radding in response to her February 23, 2023, request to have someone cover her call schedule on Sunday, February 26, 2023: "I just spoke with Jim, Aaron and Dannette. They cannot find anyone for Sunday. Do you think you will be good by Sunday to take call." Dr. Radding replied, "Okay. I need to know that I won't have to work with this OR nurse then. Because I don't feel safe having an emergency and having to rely on her." Dr. Radding clarified she would not feel safe working with this nurse in OR "before I get formal feedback that the situation is resolved or formal documentation that I am protected and that the previous issue was deemed appropriate level care." Dr. Radding further explained her position: "Sorry to set a boundary like this but it's very important for me as that emotional impact of her words were significant. If I had a 5 year track record here it would have been very different." Dr. Aboutanos responded, "Yes I understand. Hope you get rest tonight and tomorrow and have a good call Sunday."

188.    On March 1, 2023, Dr. Aboutanos emailed Dr. Radding regarding the incident with Katy Nonnemaker. Dr. Aboutanos suggested that Dr. Radding meet with Ms. Nonnemaker and Debbie Walton to discuss a way forward. Dr. Radding replied that same day, emphasizing that she "in no way want[s] to avoid working with Katy indefinitely, and [she] would never ask the system for that." Rather, she explained, "I just wanted to avoid working with her in the immediate setting until I had

notification that I had not been deemed 'unsafe.'"

189. Defendants violated VCU's own Standards of Conduct, which provide that, "[d]isruptive behavior is not tolerated; unacceptable behaviors that undermine a culture of safety include, but are not limited to:…[n]on-constructive criticism, addressed to its recipient in such a way as to undermine, belittle or to *suggest incompetence*." (Emphasis added).

190. Despite the unanimous articulated support for Dr. Radding's actions, Defendants failed to take any action to discipline Nurse Nonnemacker for her false statement to Dr. Radding that she was "unsafe" in her actions relating to the patient, which certainly suggest that Dr. Radding was "incompetent."

191. ███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

192. "The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members." *Id.* at Section V1.A.2.d).

193. "Faculty members functioning as supervising physicians must delegate portions of care to residents based on the needs of the patient and the skills of each resident." *Id.* at Section V1.A.2.d).(2)

194. Dr. Radding had accumulated numerous positive comments from other physicians, residents, and staff about how well and safely she cared for and treated patients. These comments include, but are not limited to, the following:

- "You take amazing care of the patients, I see it every day." Fiona Beckett, VCU OR.

- "You saved several lives last Sunday and then proceeded to fix several people on service this week. You stopped multiple GI bleeds that others said they wouldn't operate on. You fixed them." Sayuri Jinadasa, MD.

- Dr. Radding told Renee Cholyway, MD PGY4 General Surgery Resident about Nurse Nonnemacker's comment that Dr. Radding "didn't care about patient outcomes and that it [was] inappropriate that [she] left a resident in the OR." Renee responded, "that nurse is wrong, you obviously care for patients more so than other attendings even…I support you and I'm glad to have more strong female surgeons like you around."

- Ben Pastwich, MD Emergency Medicine Resident told Dr. Radding on January 29, 2023: "Was told in sign out 'I got two chest tubes while trauma was busy with a reboa' first question I asked was – was Dr. Radding working? Then the whole desk started talking about your badass subclavian lines and overall awesomeness."

- Dr. Radding told Dr. Proctor: "Spent a few hours with my BFF Bohl. But overall, she told me I absolutely did the right thing for the patient. Just blows to wait around for a ducking hour and a half for a gyn on surgeon to come in from home. But overall, it went okay." Dr. Proctor responded: "Yeah, I totally agree. Definitely needed the operation. That was never gonna get better without maximal invasive surgery. Strong work, Doctor."

- On December 20, 2022, Dr. Proctor told Dr. Radding: "I've heard all good things [about you] from residents."

- On January 10, 2023, Dr. Aboutanos told Dr. Radding, "You are a good surgeon and valuable member of our team."

**Defendants refuse to provide relief to Dr. Radding when she unequivocally expresses the need for time off due to extreme fatigue and burnout.**

195.    On February 22, 2023, Dr. Radding told Drs. Rossi and Bennett in her morning report that she had not had a chance to see all of her patients the previous day. She asked Dr. Rossi if he could cover the ICU primary case so that she could review the patients' charts appropriately to ensure they were providing the necessary level of care. Dr. Rossi responded he would do it, "if you absolutely need it, I guess."

196.    On February 23, 2023, Dr. Radding emailed Dr. Whelan, expressing concerns regarding a variety of patient care issues. In her email, Dr. Radding also told Dr. Whelan that her previous requests for help remained unanswered. "I don't want to burn out and give up," she wrote,

"and I don't know how to keep holding on to the high expectations…I just need some positive encouragement."

197.    On February 23, 2023, after Nurse Katy Nonnemacker accused Dr. Radding of taking an action that left the patient in an "unsafe" condition, Dr. Radding told Joshua Judge, MD Acute Care Surgery Service Attending Surgeon that, "I got my ass handed to me with sick patients, traumas, everything…Burn out level all-time high."

198.    On or around February 25, 2023, Dr. Radding expressed to Dr. Aboutanos a need to take time off work due to her experiencing extreme fatigue and stress from working three straight weeks without a single day off and asked if they could provide coverage for her Sunday, February 26, 2023, on-call duties. She told Fiona Beckett, Operating Room Nurse and the Service Team Manager of Trauma/Emergency General Surgery Team, that she made this request because she was trying to "protect my mental health as best I can."

199.    Rather than honor her request, Dr. Aboutanos required Dr. Radding to work on Sunday, February 26, 2023, claiming that no one would cover her call shift.

200.    Physicians such as Dr. Radding are obligated to be "appropriately rested and fit to provide the care required by their patients." ACGME Program Requirements for Graduate Medical Education in General Surgery ("ACGME General Surgery Requirements"), Section V1.B.1.

201.    "Residents and faculty members are at risk for burnout and depression. Programs, in partnership with their Sponsoring Institutions, have the same responsibility to address well- being as other aspects of resident competence. Physicians and all members of the health care team share responsibility for the well-being of each other." ACGME General Surgery Requirements, Section V1.C.

202.    As the "program" in this case, VCU School of Medicine, and as the "sponsoring institution," VCUHS," both have a responsibility to address "resident and faculty burnout, depression,

and substance abuse disorders." ACGME General Surgery Requirements, Section V1.C.1.e.

203.    The American College of Surgeon's Code of Professional Conduct provides that, "[t]he surgeon should maintain a satisfactory level of mental and physical fitness. A surgeon who becomes temporarily impaired by illness or injury, chemical dependence, *fatigue*, or other conditions that affect surgical judgment or performance should arrange for a qualified colleague to assume his or her official responsibilities until the impairment has been resolved." (Emphasis added).

204.    Section V1.D.2 of the ACGME General Surgery Requirements provide that, "[e]ach program must ensure continuity of patient care, consistent with the program's policies and procedures referenced in V1.C.2-VI.C.2.b), in the event that a resident may be unable to perform their patient care responsibilities due to excessive fatigue."

205.    Section V1.C.2 of the ACGME General Surgery Requirements provides that, "[t]here are circumstances in which residents may be unable to attend work, including but not limited to fatigue, illness, family emergencies, and parental leave. Each program must allow an appropriate length of absence for residents unable to perform their patient care responsibilities."

206.    Section V1.C.2.b) of the ACGME General Surgery Requirements provides that, "[t]hese policies must be implemented without fear of negative consequences for the resident who is or was unable to provide the clinical work."

207.    Defendants, in denying Dr. Radding's request for another surgeon to cover her on-call shift on February 26, 2023, after she expressed feelings of intense fatigue due to working three straight weeks without a single day off, violated Sections V1.C.2, V1.C.2.b), and V1.D.2 of ACGME General Surgery Requirements.

**Defendants require Dr. Radding to undergo a psychiatric fitness for duty examination, even though they have no objective evidence establishing the need for such an examination.**

208.    On Saturday, March 4, 2023, Dr. Radding requested call coverage for one 24-hour call shift because she needed to address a family emergency.

209.    On Tuesday, March 7, 2023, Dr. Radding returned to work and discussed her family emergency and the need for work/life balance with Dr. Whelan, who gave the impression he understood. Dr. Radding told him about the difficulties she was having in planning her wedding. She asked him, "How do I do this?," referring to how to balance her personal and professional life. He responded by telling Dr. Radding that he was on his second marriage and the difficulties he had with his first marriage. He also told her, "the good news is, you don't look tired at all." Dr. Radding mentioned to Dr. Whelan that her fiancé was staying home from work, and how she was feeling guilty about not being able to spend much time with him. Dr. Whelan told her, "go home, we got this. I have plenty of surgeons." Dr. Radding interpreted Dr. Whelan's offer as kindness of a partner allowing her to focus her efforts on her personal relationships.

210.    On Wednesday, March 8, 2023, Dr. Whelan texted Dr. Radding and told her they had coverage for her for the remainder of the week. Dr. Radding responded, "Even my Friday call? I am planning to be there," to which Dr. Whelan replied she was covered and to "take care" of herself. Dr. Radding had not requested any additional time off work, but she graciously accepted Dr. Whelan's offer thinking it had been given out of kindness.

211.    Dr. Whelan went on to tell Dr. Aboutanos about Dr. Radding's question, "How do I do this," who then, in turn, significantly misrepresented the true meaning and intent of her question, *see* Paragraph 209, *supra,* when speaking with senior personnel at VCU, including, but not limited to, Dr. Kasirajan.

212.    On March 9, 2023, Division chief, Dr. Aboutanos, called Dr. Radding to set up a meeting between her and Human Resources. The next day, Dr. Radding was informed that she was placed on medical leave and needed clearance by Employee Health to determine if she was fit to return to work.

213.    On March 10, 2023, Dr. Radding met with Dr. Aboutanos, who told her that she needed

clearance to return to work from Dr. Tortorella in Employee Health, and she could return to work immediately following that evaluation.

214.    On March 13, 2023, Dr. Radding was evaluated by Dr. Tortorella in VCU's Employee Health who determined that there was no reason at all that she should have been sent to them and that she should be returned to work with no restrictions. Dr. Radding's direct supervisor, Dr. Aboutanos, could not identify for Employee Health the requirements for her to return to work.

215.    On March 17, 2023, Dr. Aboutanos texted Dr. Radding, telling her, "I am still waiting to hear from the committee as to what is needed to communicate to you. I know Jessica [Carey] is looking into it."

216.    Dr. Radding responded to Dr. Aboutanos' text on March 17, 2023, saying, "I understand and respect the need to wait for the committee around their decision for return to work, but I am still awaiting clarity on the path that led us to the place where a committee decision is required." Dr. Radding reminded Dr. Aboutanos that Dr. Tortorella had cleared her to return to work and had communicated his recommendation to the Committee. Dr. Radding requested to meet with Dr. Aboutanos and Ms. Carey (the HR Administrator in the Department of Surgery). Dr. Aboutanos told Dr. Radding that he does "not have the final decision."

217.    During the meeting with Ms. Carey and Dr. Aboutanos on March 17, 2023, Ms. Carey claimed that she, Dr. Radding, had purportedly expressed concerns about her ability to safely return to work and care for patients when, on March 4, 2023, she asked for coverage of her call shift. Immediately after that call with Ms. Carey and Dr. Aboutanos, Dr. Radding emailed Dr. Tortorella, explaining what she meant when she asked Dr. Whelan, "How do I do this," which was in the context of attempting to balance her personal and professional life, and emphasizing that she never self-reported "an inability to take care of patients."

218.    On March 20, 2023, Dr. Radding was informed by Ms. Carey and Dr. Aboutanos that

she was required to be evaluated by a psychiatrist. Dr. Radding reviewed the list of psychiatrists' names provided to her and informed Ms. Carey and Dr. Aboutanos that 75% of those on the list were no longer practicing. She asked the Committee for help in locating a suitable psychiatrist.

219.    That same day, Dr. Radding emailed Ms. Carey, Dr. Aboutanos, and Dr. Vigneshwar Kasirajan, agreeing to be evaluated by a psychiatrist, as she is a "supporter of the process and the interest of physician and patient safety." She also explained her question of "how do I do this," referencing her March 17, 2023, email explaining the same to Dr. Tortorella.

220.    In Dr. Radding's March 20, 2023, email to Ms. Carey, Dr. Aboutanos, and Dr. Kasirajan, she also responded to the assertion in the document that they forwarded to her for signature that "behavioral concerns have been raised to include adverse interactions and unprofessional conduct with trainees and attendings." Dr. Radding stated:

> Prior to my request for time away for a personal emergency, there was no communication to me that interpersonal interactions was of significant concern. In fact, I had followed leadership guidance during both interpersonal matters mentioned, and had received confirmation that they were dealt with appropriately (from both division chief and program director independently). Given this, could you please add some clarity to this document that explains the true requirements for return to work in regards to the above statement. Pending psychiatric clearance of fit for duty to work, will there be additional barriers. Said differently, will these interpersonal issues be used as another barrier to return to clinical duties following a cleared psych evaluation.

221.    On March 22, 2023, Dr. Radding was evaluated by a VCU Psychiatrist, who cleared Dr. Radding to return to work and stated he saw no reason why she should not be working. Dr. Radding also, at the request of the Committee, emailed the psychiatrist and told him he could speak with Dr. Tortella and share her medical history with him.

222.    On March 23, 2023, Dr. Radding's personal therapist contacted Dr. Tortella and told him she also agreed that Dr. Radding should return to work.

223.    On March 24, 2023, Ms. Carey responded to Dr. Radding's March 20, 2023, email, stating that she "inquired with leadership and we are unable to amend the letter however you are not

required to sign."

224.    On or around March 29, 2023, Dr. Radding was informed that she was cleared medically, but the Committee had concerns about her professionalism and interpersonal issues. Dr. Radding asked what these concerns were, considering she had never received any feedback other than one poor review from a fellow. No one responded to Dr. Radding's question.

225.    Despite the fact that Dr. Radding had been medically cleared by three different medical personnel (Dr. Tortorella, VCU's Psychiatrist, and her own therapist), Defendants refused to allow Dr. Radding to return to work and instead kept her on forced administrative leave.

226.    On April 10, 2023, Dr. Radding was told that "it wasn't the right fit." However, just one week prior, she had been offered to run her own surgical soft tissue service. Dr. Radding politely turned down this offer and was tasked instead with assisting Dr. Whelan with his operations. This request arose out of Dr. Whelan's failure to complete schedules in a timely manner and to follow up on outdated protocols.

227.    Prior to being told "it wasn't the right fit," Dr. Anand had consistently praised Dr. Radding, including for her efforts in drafting a remediation plan for a resident who was falling behind.

228.    Out of all the surgeons in ACSS, Dr. Radding was the one who consistently was given more work to do (because her superiors knew she would actually complete the assigned tasks), and she was the one who consistently requested to know the schedules so she would know if she were on call or not.

229.    On April 10, 2023, Defendants informed Dr. Radding that her contract would not be renewed.

230.    Defendants terminated Dr. Radding on July 4, 2023.

**Drs. Aboutanos and Kasirajan defame Dr. Radding to her prospective employers.**

231.    Acting within the scope of their employment with Defendants, Dr. Aboutanos and Dr.

Kasirajan made statements in a document sent to them by a prospective employer for Dr. Radding in which they referenced Dr. Radding's purported inability to safely care for patients and her purported adverse interactions and unprofessional conduct with trainees and attendings.

232.    When asked to sign the document forwarded to Dr. Radding by Ms. Carey on or around March 20, 2023, Dr. Radding declined, and she explained in a March 20, 2023, email to Jessica Carey (VCU's HR Department), Dr. Aboutanos, and Dr. Kasirajan that the statements in that document are untrue. She explained as follows:

- Regarding her purported inability to safely return to work and care for patients:

  In a 'curb side' check in with my mentor, Dr. Whelan, I divulged the reasons for my requested time away (singular 24-hour call shift) as it related to difficulties with planning a wedding. When I asked him 'how do I do this?' referring to my personal situation, his response was, 'well I am on my second marriage and my in-laws played a major role in the first one failing' and 'well good news is you don't look tired at all.' I was seeking guidance of a well respected surgeon, mentor and friend that had found balance between work and life. My words 'I don't know how to do this' were specifically related to my personal scenario, which I believe was taken out of context and applied incorrectly towards patient care.

- Regarding her purported adverse interactions with trainees and attendings: "I had followed leadership guidance during both interpersonal matters mentioned and had received confirmation that they were dealt with appropriately (from both division chief and program director independently)."

233.    Jessica Carey replied to Dr. Radding via email (and copied Drs. Aboutanos and Kasirajan), stating, "I inquired with leadership and we are unable to amend the letter however you are not required to sign."

234.    On information and belief, the false assertions to which Dr. Radding provided truthful explanations in her March 20, 2023, email to Ms. Carey and Drs. Aboutanos and Kasirajan are the same false assertions which Drs. Aboutanos and Kasirajan repeated in their response to a request for an employment reference for Dr. Radding.

235. On July 24, 2023, Dr. Radding contacted Jessica Carey and told her: Using Dr [a]boutanos as a reference is making a negative impact on my attempt to move forward due to very different forms of communication and the narrative he is using. The statement of anxiety that I don't actually have…I really just want to move forward. Should I try to reach out to Dr Kasirajan? I am dependent on a positive reference for my career." Ms. Carey replied, "I would definitely call either Dr. Kasirajan or Dr Elizabeth Ripley (vice dean and Assoc dean for faculty affairs)."

236. Dr. Radding told Ms. Carey, "it's defamation and discrimination especially as I don't have a psychological disorder."

237. On July 26, 2023, Ms. Carey told Dr. Radding that Dr. Aboutanos and Dr. Whelan denied having told any prospective employers that Dr. Radding has "anxiety," but did confirm with her that Dr. Aboutanos has a "form from an employer" on his desk and "will complete for you."

238. As of July 28, 2023, neither Dr. Whelan nor Dr. Aboutanos had completed the form, so Dr. Radding added Drs. Proctor and Sadler to the request for a reference.

239. On July 31, 2023, Ms. Carey told Dr. Radding that, per VCUHS HR policy, they could not provide references for anyone who was not still employed at VCU. Dr. Radding explained that in order to get privileges, she had to have more than one person provide a reference.

240. On August 1, 2023, Dr. Radding told Ms. Carey that the reference had to come from a surgeon, and "Aboutanos said something that makes his [reference] unusable because it implies something bad." Dr. Radding told Ms. Carey shortly thereafter, "I was just informed that for the second time a reference from VCU has made it impossible for me to obtain privileges. This is a reportable to the board. Given I was never approached with clinical concerns nor approached with any issues prior to my personal emergency, this is now defamation."

241. Jennifer Pearsall with Weatherby Locums told Dr. Radding in July 2023 that "not getting response from references is going to hold us up." Ms. Pearsall thereafter told Dr. Radding that

Dr. Aboutanos had completed the hospital's reference, but not theirs.

242.    Dr. Radding also applied for a per diem position with UPMC. The credentialing reference that Dr. Kasirajan provided to UPMC contained so much defamatory information about Dr. Radding that she lost the signed contract with them. Three separate individuals (Dr. Ronan Elefant, Nicole Nardini (HR), and the credentialing expert) told Dr. Radding it was the worst reference they had ever seen and told her to never use VCU as a reference again. UPMC's Surgery Department attempted to find a way to employ Dr. Radding anyway and disregard the reference from Dr. Kasirajan, but it was so bad there were no aspects of the job they could salvage without a credentialing reference.

**Defendants retaliate against Dr. Radding for reporting the misconduct and the failures to adhere to the standards of care.**

243.    Dr. Radding reported violations of federal and state laws and regulations and guidance, *see* Table of Reporting and Retaliation, Paragraph 178, *supra*.

244.    Defendants engaged in a series of actions in retaliation for Dr. Radding's reporting these violations. These actions include, but are not limited to, the following:

a.    Defendants forced Dr. Radding on administrative leave because of their intentional misinterpretation and misrepresentation of her statement to Dr. Whelan when she asked him, "How do I do this?" Dr. Aboutanos intentionally misrepresented to senior personnel at VCU, including Dr. Kasirajan, Dr. Radding's question to Dr. Whelan, "How do I do this?" to mean that she expressed concerns about her ability to safely return to work and care for patients. Dr. Radding never expressed concerns to any of the Defendants about her ability to safely return to work and care for patients. Dr. Radding's surgical and non-surgical outcomes during her employment at VCU and with MCV Physicians speak volumes about her clinical acumen and decision-making in a very high volume, level-one trauma center. But for Dr. Radding bravely speaking

up for patient safety, she would have continued to work for Defendants.

b. Defendants subjected Dr. Radding to a psychiatric fitness for duty evaluation, despite not having any objective evidence that her ability to perform any of the essential functions of her position was impaired by a medical condition, or that she could perform the essential functions of her position, but her doing so would pose a "direct threat" to her own safety or the safety of others. Defendants' concerns about Dr. Radding's purported "interpersonal behaviors" do not rise to the level of "disruptive behaviors" as identified by the American Board of Surgeons and the American Board of Psychiatry.

c. Defendants failed to provide the fitness for duty examiners any of the information that is required, to-wit: a detailed description of Dr. Radding's essential job duties and the Defendants' purported concerns, which rendered Dr. Radding unable to provide specific facts to counter those concerns.

d. Defendants refused to renew Dr. Radding's contract of employment.

e. Defendants terminated Dr. Radding's employment.

f. Along with terminating Dr. Radding's employment, Defendants terminated her surgical privileges.

g. Human Resources falsely assured Dr. Radding that she would receive a positive reference from Dr. Kasirajan.

h. Defendants intentionally provided false employment references for Dr. Radding, knowing that these references would preclude her from acquiring comparable employment after she was unlawfully terminated. Dr. Radding has had multiple job opportunities denied to her because Dr. Kasirajan and Dr. Aboutanos provided false statements about her fitness to be a surgeon, which have resulted in Dr. Radding's

inability to get privileges not only as a trauma surgeon but as a general surgeon.

**Dr. Radding is discriminated against on the basis of her sex and retaliated against for reporting the discrimination.**

245.    Before Dr. Radding started working for the Defendants, Dr. Joshua Judge (male) screamed violently at an Administrative Assistant because he was not allowed to take time off. Dr. Judge, who was under the same supervisor as Dr. Radding—Dr. Aboutanos—was not reprimanded for his violent outburst. Yet, Dr. Radding was told by Dr. Aboutanos that she needed to go out of her way to be nice to the nursing staff, was reprimanded when she redirected residents who were not taking proper care of patients and was deemed to be a "bully."

246.    Some of the male surgeons told Dr. Radding when they had incidents with the nursing staff, they were not reprimanded.

247.    Shortly after Dr. Radding started working for the Defendants, she was publicly scolded by Dr. Aboutanos during a meeting attended by other surgeons and residents because she had worn her scrubs into the hospital. Attending this meeting were male surgeons (Dr. Judge and Dr. Sadler) who had also worn their scrubs into the hospital but were not admonished by Dr. Aboutanos.

248.    In Patient Case #8, the urology resident (male) blamed Dr. Radding because the imaging tests were not ordered. The urology resident told Dr. Radding, "Well, it seems like you are the kinda girl who is going to call me because you are too afraid to ever put in a foley."

249.    Dr. Radding reported the urology resident's derogatory and discriminatory statement to Dr. Michel Aboutanos (male, ACSS Surgeon). Dr. Aboutanos dismissed the urology resident's gender stereotyped statement and disrespectful treatment of Dr. Radding by telling Dr. Radding that the resident was just "playing a joke" on her.

250.    Dr. Aboutanos claimed there was a protocol in place for treating uretheral injuries. When Dr. Radding responded that she had already looked, but there was no such protocol, Dr. Aboutanos responded by saying, "Sydney, you gotta lower your standard of care, and stop caring too

much." Dr. Radding reported his demeaning comment to Dr. James Whelan (male, ACSS Surgeon), but he never followed up with her or addressed the issue with Dr. Aboutanos.

251. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████

252. Dr. Radding expressed her concerns to Dr. Whelan about Dr. Aboutanos not taking her seriously because she is a woman, writing in a January 2023, text to Dr. Whelan: "I don't have any other way to verbalize things or advocate for myself."

253. Dr. Sadler (male), who started working for the Defendants around the same time as Dr. Radding, called the attending anesthesiologist (Christine Kim, female) and cardiac surgeons "idiots." Dr. Sadler was not reprimanded or disciplined for his clearly offensive name calling.

254. In February 2023, Dr. Judge made a request to Dr. Aboutanos that he not be required to attend the public Pediatric Advanced Life Support training or take pediatric calls. Dr. Judge explained to Dr. Radding he made this request because he had been traumatized by the death of his young son. Dr. Aboutanos granted his request. Yet, when Dr. Radding expressed to Drs. Whelan and Aboutanos that she needed to take one day off for her mental health and asked for someone else to cover her shift, she was told no, she had to take the shift.

255. Dr. Radding's requests for time off were generally denied, including in February 2023, when she asked to have one weekend off to visit with her family who had flown from Oregon to Richmond to spend time with her, and she had worked for four weeks straight without a single day off; yet, the requests from male surgeons for time off were generally granted.

256. When Dr. Radding asked Dr. Aboutanos what she should ask him privately so that he

would not reprimand her publicly, he responded, "It's not a woman thing; it's just a new surgeon thing." Interestingly, Dr. Radding had not brought up her gender as a reason for his publicly reprimanding her.

257. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

258.    In February 2023, Defendants forced Dr. Radding to take administrative leave because of their intentional misinterpretation and misrepresentation of her question to Dr. Whelan, "How do I do this?" Dr. Radding had asked Dr. Whelan this question when they were discussing how he was able to spend time with his family despite his hectic schedule at work, and Dr. Radding was trying to figure out how to balance her work life with her personal life. Dr. Whelan suggested that she take off work, saying, "go home, we got this, I have plenty of surgeons." During the days which followed, Dr. Radding did not request additional time off work, nor was she asked whether she was able to return to work.

259.    Dr. Aboutanos intentionally misrepresented to senior personnel at VCU and VCUHS Dr. Radding's question to Dr. Whelan, "How do I do this?" to mean that she expressed concerns about her ability to safely return to work and care for patients. Dr. Radding never expressed concerns, to anyone at VCU, VCUHS, or to any MCV Physicians, about her ability to safely return to work and care for patients.

260.    Dr. Radding's surgical and non-surgical outcomes during her employment with Defendants speak volumes about her clinical acumen and decision-making in a very high volume, level-one trauma center. For example, on one day in mid-December 2022, Dr. Radding (with only the assistance of one (1) fellow) performed seven (7) major operations—including doing a procedure that VCU had not performed in years. She had no problems controlling her emotions— despite having to

operate on seven people who were near death.

261.    While Dr. Radding was on her forced administrative leave, she was required to get clearance from a psychiatrist that she was mentally capable of handling her duties as a trauma surgeon. On or around March 13, 2023, Dr. Radding was first cleared by Dr. Tortorella, an internal medicine doctor who was the head of employee health. She was then cleared to return to work by the VCU psychiatrist.

262.    Despite the fact that VCU's psychiatrist cleared Dr. Radding to return to work with no restrictions, Defendants refused to return her to work, citing to concerns about her purported "interpersonal" issues. These "interpersonal" issues all relate to her interactions with the nursing staff and residents, which, as explained above, were no more harsh than the male surgeons' interactions with them.

263.    After Defendants refused to return Dr. Radding to work, they cancelled her contract months before its termination date (June 2023). In contrast, when Dr. Judge voiced concerns about not being able to handle taking the public pediatric training course or take pediatric calls because he was so traumatized by the death of his young son, Defendants did not subject him to a required evaluation by a psychiatrist, place him on forced administrative leave, or terminate his contract early. Nor did Defendants cancel the contracts of Dr. Judge or Dr. Sadler, even though they admittedly verbally abused the nursing staff.

264.    Nor did Defendants require Dr. Whelan, who suffers from Parkinsons' Disease and has visible tremors in his hands, to undergo a physical evaluation to determine his fitness as a surgeon. Even after a patient's family reported their concerns to Defendants about Dr. Whelan's physical condition, Defendants did not cancel Dr. Whelan's contract or take any action whatsoever to determine his fitness to perform surgeries; in fact, Dr. Aboutanos refused to report Dr. Whelan's handicap to the Board--which was in violation of many Board regulations.

265. On or around April 10, 2023, VCU informed Dr. Radding that her contract would not be renewed because she "was not the right fit" for VCU.

266. After she was unlawfully terminated, Human Resources falsely assured Dr. Radding that she would receive a positive employment reference from Dr. Kasirajan. Notably, during the course of her employment with Defendants, Dr. Radding was never subjected to disciplinary action and received only positive feedback from superiors. Nevertheless, Defendants intentionally provided false employment references for Dr. Radding, knowing that these references would preclude her from acquiring comparable employment after she was unlawfully terminated. In fact, Dr. Radding has had multiple job opportunities denied to her because Dr. Kasirajan and Dr. Aboutanos knowingly provided negative references to prospective employers.

267. VCU's "Duty to Report and Protection from Retaliation" "requires all employees to report any known or suspected violation of applicable laws, regulations, or university policies, hereinafter referred to as misconduct, in a timely manner regardless of their personal feelings or beliefs about the misconduct in those involved."

268. VCU's "Duty to Report" also requires "any employee in management [who[] receives a report…to contact the ICO-ACS for tracking purposes, support, and guidance."

269. VCU's "Preventing and Responding to Discrimination" policy provides that, "[i]t is the responsibility of every member of the VCU community to foster an environment free from unlawful discrimination and harassment."

270. VCU's "Preventing and Responding to Discrimination" policy further provides that, "[v]iolations of this policy are serious offenses and may result in discipline or other administrative action, up to and including expulsion or termination."

271. Defendants failed to take any disciplinary action against the urology resident for making the gender-biased remark to Dr. Radding.

272.    Defendants failed to take any disciplinary action against Dr. Rodas when he usurped Dr. Radding's authority and called in Dr. Craig Sadler to perform the scrub.

273.    Defendants failed to take any disciplinary action against Dr. Aboutanos when he failed to report the urology resident who made the gender-biased stereotyped statement to Dr. Radding.

274.    Defendants failed to take any disciplinary action against Dr. Whelan when he failed to report Dr. Aboutanos' discriminatory treatment of Dr. Radding in consistently refusing to take her seriously because she is a woman.

275.    Instead of taking any disciplinary action against Dr. Rodas, Dr. Whelan, Dr. Aboutanos, or the urology resident, Defendants retaliated against Dr. Radding for complaining about being discriminated against. This retaliation consisted of:

   a.   ███████████████████████████████████████████████

   ███████████████████████████████████████████████

   ███████████████████████████████████

   b.   VCU and MCV Physicians refusing to allow Dr. Radding to take a day off in February 2023, after she had worked three weeks straight without a day off.

   c.   VCU and MCV Physicians forcing Dr. Radding on administrative leave because of their intentional misinterpretation and misrepresentation of her statement to Dr. Whelan when she asked him, "How do I do this?" Dr. Aboutanos intentionally misrepresented to senior personnel at VCU Dr. Radding's question to Dr. Whelan, "How do I do this?" to mean that she expressed concerns about her ability to safely return to work and care for patients. Dr. Radding never expressed concerns, to anyone at VCU or to any MCV Physicians, about her ability to safely return to work and care for patients. Dr. Radding's surgical and non-surgical outcomes during her employment at VCU and with MCV Physicians speak volumes about her clinical acumen and decision-making

in a very high volume, level-one trauma center. But for Dr. Radding bravely speaking up for patient safety, she would have continued to work at VCU.

d. VCU and MCV Physicians terminating Dr. Radding's contract, not renewing that contract, and taking away her surgical privileges. On April 10, 2023, VCU informed Dr. Radding that her contract would not be renewed because she "was not the right fit" for VCU.

e. Human Resources falsely assured Dr. Radding that she would receive a positive reference from Dr. Kasirajan. Notably, Dr. Radding was never subjected to disciplinary action and received only positive feedback from superiors.

f. VCU and MCV Physicians intentionally provided false employment references for Dr. Radding, knowing that these references would preclude her from acquiring comparable employment after she was unlawfully terminated. Dr. Radding has had multiple job opportunities denied to her because Dr. Kasirajan and Dr. Aboutanos provided an overall negative reference.

**COUNT I**
**DEFENDANTS VCU and VCUHS**
**FRAUD AND ABUSE WHISTLEBLOWER PROTECTION ACT**
**VIRGINIA CODE § 2.2-3011**

276. Dr. Radding realleges and incorporates herein by reference Paragraphs 48-275, *supra.*

277. Virginia's Fraud and Abuse Whistleblower Protection Act ("VWPA"), Va Code Ann. § 2.2-3010 *et seq.,* prohibits an employer from discharging, threatening, or otherwise discriminating or retaliating against a whistle blower whether acting on his own or through a person acting on his behalf or under his direction. Va. Code Ann. § 2.2-3011.

278. The VWPA defines "governmental agency" as "any agency, institution, board, bureau, commission, council, or instrumentality of state government in the executive branch." Va. Code Ann. § 2.2-3010.

279.    The VWPA defines "employee" as "any person who is regularly employed full time on either a salaried or wage basis, whose tenure is not restricted as to temporary or provisional appointment, in the service of and whose compensation is payable, no more often than biweekly, in whole or in part, by a governmental agency." Va. Code Ann. § 2.2-3010.

280.    The VWPA defines "employer" as "a person supervising one or more employees, including the employee filing a good faith report, a superior of that supervisor, or an agent of the governmental agency." Va. Code Ann. § 2.2-3010.

281.    The VWPA defines "wrongdoing" as "a violation, which is not of a merely technical or minimal nature, of a federal or state law or regulation, local ordinance, or a formally adopted code of conduct or ethics of a professional organization designed to protect the interests of the public or employee." Va. Code Ann. § 2.2-3010.

282.    The VWPA defines "whistle blower" as "an employee who witnessed… wrongdoing… and demonstrates by clear and convincing evidence that she is about to make a good faith report of… the wrongdoing to one of the employee's superiors, an agent of the employer, or an appropriate authority." Va. Code Ann. § 2.2-3010.

283.    The VWPA defines "appropriate authority" to include "a member, officer, agent, representative, or supervisory employee of the agency or organization." Va. Code. Ann. § 2.2-3010.

284.    Defendant VCUHS is a "government agency" because it is an instrumentality of the Commonwealth of Virginia and a political subdivision, established under Va. Code Ann. §23.1-2401. The Virginia Code equates political subdivisions in the Commonwealth to counties, cities, town, boroughs, and any other division vested with the authority to enact rules and regulations having the force or effect of law. Va. Code Ann. § 8.01-385(3).

285.    Defendant VCU is a "government agency" because it is an instrumentality of the Commonwealth of Virginia: "The board of visitors of Virginia Commonwealth University (the board)

is a corporation under the name and style of 'Virginia Commonwealth University…,' and shall at all times be under the control of the General Assembly." Va. Code Ann. § 23.1-2300(A).

286.   Dr. Radding is an "employee" because she was a full-time, salaried employee of Defendants and was paid, in whole or in part, by a government agency from November 14, 2022, to July 4, 2023, and her tenure was not restricted to temporary or provisional appointment.

287.   Defendants VCU and VCUHS are "employers" within the definition of the VWPA because they either supervised Plaintiff or were superiors of her supervisors.

288.   Defendants VCU and VCUHS committed "wrongdoing" by engaging in the actions set forth herein, Paragraphs 48-275, *supra*.

289.   Plaintiff is a "whistle blower" within the meaning of the VWPA because she reported this wrongdoing in good faith to her superiors and/or agents of VCU and VCUHS. *See* Table of Reporting and Retaliation, Paragraph 178, and 48-275, *supra*.

290.   Dr. Radding was retaliated against by Defendants VCU and VCUHS. This retaliation consisted of:

    a.   ███████████████████████████████████████████████

        ███████████████████████████████████████████████

        ███████████████████████████

    b.   Defendants VCU and VCUHS refusing to allow Dr. Radding to take a day off in February 2023, after she had worked three weeks straight without a day off.

    c.   Defendants VCU and VCUHS forcing Dr. Radding on administrative leave because of their intentional misinterpretation and misrepresentation of her statement to Dr. Whelan when she asked him, "How do I do this?" Dr. Aboutanos intentionally misrepresented to senior personnel at VCU Dr. Radding's question to Dr. Whelan, "How do I do this?" to mean that she expressed concerns about her ability to safely return to work and care

for patients. Dr. Radding never expressed concerns, to anyone at VCU or VCUHS, about her ability to safely return to work and care for patients. Dr. Radding's surgical and non-surgical outcomes during her employment with Defendants speak volumes about her clinical acumen and decision-making in a very high volume, level-one trauma center. But for Dr. Radding bravely speaking up for patient safety, she would have continued to work for Defendants.

d.  Defendants VCU and VCUHS subjecting Dr. Radding to a psychiatric fitness for duty evaluation without having any objective evidence of the need for such an evaluation.

e.  Defendants VCU and VCUHS terminating Dr. Radding's contract, not renewing that contract, and taking away her surgical privileges. On April 10, 2023, VCU and VCUHS informed Dr. Radding that her contract would not be renewed because she "was not the right fit" for VCU.

f.  Human Resources falsely assuring Dr. Radding that she would receive a positive reference from Dr. Kasirajan. Notably, Dr. Radding was never subjected to disciplinary action and received only positive feedback from superiors.

g.  Defendants VCU and VCUHS intentionally providing false employment references for Dr. Radding, knowing that these references would preclude her from acquiring comparable employment after she was unlawfully terminated. Dr. Radding has had multiple job opportunities denied to her because Dr. Kasirajan and Dr. Aboutanos provided false and negative employment references.

291.  By retaliating against Dr. Radding because she made good-faith reports of violations of federal and state laws and regulations pertaining to patient safety, Defendants VCU and VCUHS violated the VWPA, Va. Code Ann. § 2.2-3011.

292.  As an actual and proximate cause of Defendants VCU and VCUHS's actions, Dr.

Radding has: suffered loss of her positions as a Physician and as an Assistant Professor at VCU in the Department of Surgery, Division of Acute Care Surgical Services ("ACSS"); lost wages and benefits; lost career opportunities; and has incurred substantial attorneys' fees and costs in seeking a legal remedy for Defendants VCU and VCUHS's unlawful conduct.

293.    As an actual and proximate cause of Defendants VCU and VCUHS's unlawful conduct resulting in the aforementioned damages to Dr. Radding, she seeks: reinstatement to the same positions she held prior to being unlawfully terminated; or in the alternative to reinstatement, front pay; backpay for the wages she lost from the time of her termination to the present, plus interest thereon; compensation for the benefits Dr. Radding lost as a result of the unlawful termination; and compensation for the reasonable attorneys' fees and costs she has incurred and will continue to incur through the date of resolution.

**COUNT II**
**ALL DEFENDANTS**
**VIRGINIA WHISTLEBLOWER ROTECTION LAW**
**VIRGINIA CODE ANN. § 40.1-27.3**

294.    Dr. Radding realleges and incorporates herein by reference Paragraphs 48-275, *supra.*

295.    The Virginia Whistleblower Protection Law, Va. Code Ann. § 40.1-27.3 ("VWPL"), makes it unlawful for an employer to "discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee…in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official." Va. Code Ann. § 40.1- 27.3(A)(1).

296.    VWPL defines an "employer" as "an individual, partnership, association, corporation, legal representative, receiver, trustee, or trustee in bankruptcy doing business in or operating within this Commonwealth who employs another to work for wages, salaries, or on commission…." Va. Code Ann. § 40.1-2.

297.    VWPL defines an "employee" to mean "any person, who, in consideration of wages, salaries or commissions, may be permitted, required or directed by any employer to engage in any employment directly or indirectly." Va. Code Ann. § 40.1-2.

298.    Defendants VCU, VCUHS, and MCV Physicians are "employers" and Dr. Radding is an "employee" under the VWPL.

299.    All Defendants are joint employers of Dr. Radding. See Paragraphs 14-28, *supra,* realleged and incorporated herein by reference.

300.    Dr. Radding's term of employment with Defendants was from November 14, 2022, through June 30, 2023. Absent termination for cause, MCV Physicians "intends to provide [Dr. Radding] with another Employment Agreement starting the first of July [2023]."

301.    Defendant VCUHS is a "government body" because it is an instrumentality of the Commonwealth of Virginia and a political subdivision, established under Va. Code Ann. §23.1-2401. The Virginia Code equates political subdivisions in the Commonwealth to counties, cities, town, boroughs, and any other division vested with the authority to enact rules and regulations having the force or effect of law. Va. Code Ann. § 8.01-385(3).

302.    Defendant VCU is a "government body" because it is an instrumentality of the Commonwealth of Virginia: "The board of visitors of Virginia Commonwealth University (the board) is a corporation under the name and style of 'Virginia Commonwealth University…,' and shall at all times be under the control of the General Assembly." Va. Code Ann. § 23.1-2300(A).

303.    Dr. Radding in good faith reported to her supervisors, Doctors Aboutanos and Whelan, and to Drs. Proctor, Jinadasa, and Rodas, who are agents of the government bodies VCU and VCUHS, violations of federal and state laws and regulations pertaining to patient safety. *See* Table of Reporting and Retaliation, *supra,* Paragraph 178 and Paragraphs 48-275, *supra.*

304.    Defendants retaliated against Dr. Radding. This retaliation consisted of:

a. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

b. Defendants refusing to allow Dr. Radding to take a day off in February 2023, after she had worked three weeks straight without a day off.

c. Defendants forcing Dr. Radding on administrative leave because of their intentional misinterpretation and misrepresentation of her statement to Dr. Whelan when she asked him, "How do I do this?" Dr. Aboutanos intentionally misrepresented to senior personnel at VCU Dr. Radding's question to Dr. Whelan, "How do I do this?" to mean that she expressed concerns about her ability to safely return to work and care for patients. Dr. Radding never expressed concerns, to anyone at VCU, VCUHS, or MCV Physicians, about her ability to safely return to work and care for patients. Dr. Radding's surgical and non-surgical outcomes during her employment with Defendants speak volumes about her clinical acumen and decision-making in a very high volume, level-one trauma center. But for Dr. Radding bravely speaking up for patient safety, she would have continued to work for Defendants.

d. Defendants subjecting Dr. Radding to a psychiatric fitness for duty evaluation without having any objective evidence of the need for such an evaluation.

e. Defendants terminating Dr. Radding's contract, not renewing that contract, and taking away her surgical privileges. On April 10, 2023, VCU and VCUHS informed Dr. Radding that her contract would not be renewed because she "was not the right fit" for VCU.

f. Human Resources falsely assuring Dr. Radding that she would receive a positive reference from Dr. Kasirajan. Notably, Dr. Radding was never subjected to disciplinary

action and received only positive feedback from superiors.

g. Defendants intentionally providing false employment references for Dr. Radding, knowing that these references would preclude her from acquiring comparable employment after she was unlawfully terminated. Dr. Radding has had multiple job opportunities denied to her because Dr. Kasirajan and Dr. Aboutanos provided false and negative employment references.

305. By retaliating against Dr. Radding because she made good-faith reports of violations of federal and state laws and regulations pertaining to patient safety, Defendants violated the VWPL, Va. Code Ann. § 40.1-27.3.

306. As an actual and proximate cause of Defendants' actions, Dr. Radding has suffered loss of her positions as a Physician and as an Assistant Professor at VCU in the Department of Surgery, Division of Acute Care Surgical Services ("ACSS"); lost wages and benefits; loss of career opportunities; and has incurred substantial attorneys' fees and costs in seeking a legal remedy for Defendants' unlawful conduct.

307. As an actual and proximate cause of Defendants' conduct resulting in the aforementioned damages to Dr. Radding, she seeks: reinstatement to the same positions she held prior to being unlawfully terminated; or in the alternative to reinstatement, front pay; backpay for the wages she lost from the time of her termination to the present, plus interest thereon; compensation for the benefits Dr. Radding lost as a result of the unlawful termination; and compensation for the reasonable attorneys' fees and costs she has incurred and will continue to incur through the date of resolution.

### COUNT III
### ALL DEFENDANTS
### TITLE VII OF THE CIVIL RIGHTS ACT
### DISCRIMINATION ON THE BASIS OF SEX

308. Dr. Radding realleges and incorporates herein by reference Paragraphs 245-275, *supra.*

309. Title VII of the Civil Rights Act of 1964 states that it "shall be an unlawful employment

practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S. Code § 2000e–2(a)(1).

310. Defendants were and continue to be "employers" within the meaning of Title VII.

311. Dr. Radding was an "employee" of Defendants within the meaning of Title VII.

312. Dr. Radding is female.

313. Defendants discriminated against Dr. Radding on the basis of her sex (female) when:

   a. Dr. Rodas limited Dr. Radding's career opportunity when he requested that a male surgeon, Dr. Craig Sadler, perform a scrub during a surgical procedure instead of calling Dr. Radding to do the scrub—despite the fact she was present and watching the procedure and had performed other tasks significant to the surgery;

   b. Dr. Aboutanos consistently refused to address Dr. Radding's concerns about patient safety, instead condescending to her and telling her that she took patient safety "too seriously."

   c. Dr. Aboutanos refused to take seriously Dr. Radding's report to him of the gender stereotyped remark made to her by the urology resident that, "Well, it seems like you are the kinda girl who is going to call me because you are too afraid to ever put in a foley." Instead of reporting the discriminatory remark, as he was required to do under VCU's Code of Conduct, Dr. Aboutanos minimized it and told Dr. Radding that the resident was "only joking."

   d. Dr. Whelan acquiesced to Dr. Aboutanos when he failed to report Dr. Aboutanos' treating Dr. Radding in a condescending manner based on her sex when Dr. Radding reported his behavior to him.

   e. Defendants treated Dr. Radding less favorably than the male surgeons, to-wit: Dr.

Judge, Dr. Sadler, Dr. Whelan. *See* Paragraphs 245-247, 251, 253-255, 263-264, *supra,* incorporated herein by reference.

f.   Defendants forced Dr. Radding to take administrative leave based on Dr. Aboutanos' intentionally misrepresenting her question to Dr. Whelan of, "How do I do this?" to mean she was "self-admitting" she could not safely care for patients.

g.   Defendants subjected Dr. Radding to a psychiatric fitness for duty evaluation without having any objective evidence of the need for such an evaluation.

h.   Defendants terminated Dr. Radding's contract, refused to renew her contract, and took away her surgical privileges. On April 10, 2023, VCU and VCUHS informed Dr. Radding that her contract would not be renewed because she "was not the right fit" for VCU.

i.   Human Resources falsely assured Dr. Radding that she would receive a positive reference from Dr. Kasirajan. Notably, Dr. Radding was never subjected to disciplinary action and received only positive feedback from superiors.

j.   Defendants intentionally provided false employment references for Dr. Radding, knowing that these references would preclude her from acquiring comparable employment after she was unlawfully terminated. Dr. Radding has had multiple job opportunities denied to her because Dr. Kasirajan and Dr. Aboutanos provided false and negative employment references.

314.   As an actual and proximate result of Defendants' discriminatory actions, Dr. Radding has: suffered emotional and mental distress; lost her positions as a Physician and as an Assistant Professor at VCU in the Department of Surgery, Division of Acute Care Surgical Services ("ACSS"); lost wages and benefits; lost career opportunities; and has incurred substantial attorneys' fees and costs in seeking a legal remedy for Defendants' unlawful conduct.

315. As an actual and proximate cause of Defendants' unlawful conduct resulting in the aforementioned damages to Dr. Radding, she seeks: reinstatement to the same positions she held prior to being unlawfully terminated; or in the alternative to reinstatement, front pay; backpay for the wages she lost from the time of her termination to the present, plus pre- and post-judgment interest thereon; compensation for the benefits Dr. Radding lost as a result of the unlawful termination; compensation for the reasonable attorneys' fees and costs she has incurred and will continue to incur through the date of resolution; and emotional and mental distress damages in the amount of $300,000.

**COUNT IV**
**ALL DEFENDANTS**
**TITLE VII OF THE CIVIL RIGHTS ACT**
**RETALIATION FOR OPPOSING DISCRIMINATORY ACTIONS**

316. Dr. Radding realleges and incorporates herein by reference Paragraphs 245-275, *supra.*

317. Title VII states that it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S. Code § 2000e–3.

318. Dr. Radding complained to her supervisor, Dr. Aboutanos, and to Dr. Whelan, her mentor, about the discrimination to which she was being subjected on the basis of her sex. *See* Paragraphs 249-250, 252, *supra,* incorporated herein by reference.

319. Defendants failed to take prompt corrective action in response to Dr. Radding's complaints of discrimination.

320. Dr. Radding engaged in protected activities when she complained of discrimination.

321. Defendants retaliated against Dr. Radding because she engaged in protected activities when:

    a. Defendants forced Dr. Radding to take administrative leave based on Dr. Aboutanos'

intentionally misrepresenting her question to Dr. Whelan of, "How do I do this?" to mean she was "self-admitting" she could not safely care for patients.

b.  Defendants subjected Dr. Radding to a psychiatric fitness for duty evaluation without having any objective evidence of the need for such an evaluation.

c.  Defendants terminated Dr. Radding's contract, refused to renew her contract, and took away her surgical privileges. On April 10, 2023, VCU and VCUHS informed Dr. Radding that her contract would not be renewed because she "was not the right fit" for VCU.

d.  Human Resources falsely assured Dr. Radding that she would receive a positive reference from Dr. Kasirajan. Notably, Dr. Radding was never subjected to disciplinary action and received only positive feedback from superiors.

e.  Defendants intentionally provided false employment references for Dr. Radding, knowing that these references would preclude her from acquiring comparable employment after she was unlawfully terminated. Dr. Radding has had multiple job opportunities denied to her because Dr. Kasirajan and Dr. Aboutanos provided false and negative employment references.

322.    The actions which Defendants took in retaliation for Dr. Radding's engaging in protected activities are of the type which would dissuade a reasonable employee from engaging in protected activities.

323.    Dr. Radding's protected activities and her termination were causally connected and not unrelated.

324.    As an actual and proximate cause of Defendants' conduct, Dr. Radding has suffered emotional distress, embarrassment, humiliation, and lost wages and benefits.

325.    As an actual and proximate cause of Defendants' unlawful conduct resulting in the aforementioned damages to Dr. Radding, she seeks: reinstatement to the same positions she held prior to being unlawfully terminated; or in the alternative to reinstatement, front pay; backpay for the wages she lost from the time of her termination to the present, plus pre- and post-judgment interest thereon; compensation for the benefits Dr. Radding lost as a result of the unlawful termination; compensation for the reasonable attorneys' fees and costs she has incurred and will continue to incur through the date of resolution; and emotional and mental distress damages in the amount of $300,000.

## COUNT V
## COMMON LAW DEFAMATION
## ALL DEFENDANTS

326.    Plaintiff realleges and incorporates by reference Paragraphs 231-242, *supra.*

327.    "Defamatory words that 'prejudice [a] person in his or her profession or trade' are actionable as defamation *per se.*" *Fuste v. Riverside HealthCare Assoc., Inc.,* 265 Va. 127, 575 S.E.2d 858, 861 (2003) (citation omitted). "[T]he alleged statements that Drs. Fuste and Vanden Hoek 'abandoned' their patients and that there were 'concerns about their competence' not only prejudice the doctors in the practice of their profession…but also contain 'a provably false factual connotation.'" *Id.* at 575 S.E.2d at 861 (internal citation omitted).

328.    Defendants' statements that Dr. Radding was not able to safely return to work and care for her patients constitutes defamation *per se,* as those statements prejudice Dr. Radding in the practice of her profession and contains a provably false factual connotation. *See id.*

329.    Defendants' repeating those statements to Dr. Radding's prospective employers constitutes defamation *per se,* as those statements prejudice Dr. Radding in the practice of her profession and contain a provably false connotation. *See id.*

330.    As a direct and proximate result of Defendants' actions in defaming Dr. Radding, she has suffered and continues to suffer. Dr. Radding has: suffered emotional and mental distress; lost her positions as a Physician and as an Assistant Professor at VCU in the Department of Surgery, Division of Acute Care Surgical Services ("ACSS"); lost wages and benefits; lost career opportunities; has incurred substantial attorneys' fees and costs in seeking a legal remedy for Defendants' unlawful conduct; has experienced financial losses as a result of not being able to secure comparable employment, including, but not limited to, lost wages and benefits, having to sell a brand-new house for less than she paid for it; paying rent on an apartment in the metro DC area with the expectation she would have per diem work for another medical facility—which did not transpire as a result of the defamatory reference that VCU and MCV Physicians provided to this facility; out-of-pocket medical expenses for monthly prescriptions; and out-of-pocket expenses for therapy.

331.    As an actual and proximate cause of Defendants' conduct resulting in the aforementioned damages to Dr. Radding, she seeks: reinstatement to the same positions she held prior to being unlawfully terminated; or in the alternative to reinstatement, front pay; backpay for the wages she lost from the time of her termination to the present, plus pre- and post-judgment interest thereon; compensation for the benefits Dr. Radding lost as a result of the unlawful termination; compensation for the reasonable attorneys' fees and costs she has incurred and will continue to incur through the date of resolution; emotional and mental distress damages in the amount of $750,000; consequential damages for the financial losses she has suffered; injunctive relief to prevent Defendant from providing any additional defamatory employment references to Dr. Radding's prospective employers and to require Defendants to provide factually accurate references so that Dr. Radding can get surgical privileges with future employers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Dr. Sydney Radding, respectfully requests that this Honorable

Court enter judgment in her favor on all Counts of her Complaint and against Defendants Virginia

Commonwealth University Health Care System, VCU, and MCV Association Physicians d/b/a

MCV Associated Physicians and award her the following relief:

(a)     Entry of judgment in favor of Dr. Radding on all Counts;

(b)     Reinstate Dr. Radding into the position(s) she formerly occupied with

        Defendants; or in the alternative, award her front pay;

(c)     Award of back pay for Plaintiff against Defendants;

(d)     Award of compensatory damages for Plaintiff against Defendants;

(e)     Award of consequential damages for Plaintiff against Defendants;

(f)     Award of reasonable attorneys' fees and litigation costs and expenses for

        Plaintiff against Defendants;

(g)     Award of pre and post judgment interest for Plaintiff;

(h)     Award injunctive relief for Plaintiff against Defendants as requested in

        Paragraph 331, *supra; and*

(i)     Any other relief that this Court deems equitable, appropriate, and just.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury on all issues so triable.

Respectfully submitted,

*/s/Valerie A. Teachout*
Valerie A. Teachout, Esq. (VSB 70887)
THE SPIGGLE LAW FIRM, P.C.
3601 Eisenhower Ave, Suite 425
Alexandria, Virginia 22304
V. Teachout Direct Line (571) 513-6942
Telephone: (202) 449-8527
Facsimile: (202) 517-9179

E-Mail: vteachout@spigglelaw.com

***Counsel for Plaintiff Dr. Sydney Radding***